Between HENRY ROBINSON and others, appellants, and DAVID C. URQUHART and others, respondents.

Urquhart applied for a loan of $10,000, through his agent, Pilling, to John B. Myers, one of the firm of Myers, Claghorn and Company. This arrangement was effected : *viz.* John B. Myers exchanged four of the notes of his firm, of $2500 each, payable in six months, for Pilling's notes of like tenor, the notes of the latter to fall due a few days in advance of the firm notes. A bond and mortgage in the amount of $10,000, executed by Urquhart to John B. Myers, was delivered as collateral security to the notes of Pilling. When the notes of Pilling matured, they were taken up and paid by the avails of other notes of Myers, Claghorn and Company, and were surrendered to him in exchange of other notes made by him. Again, when the second set matured, they were arranged in like manner. After the last notes of Pilling fell due, and while they remained unpaid, the mortgage was assigned to a *bona fide* purchaser. The complainants were judgment creditors of Urquhart, and filed this bill to set aside the mortgage. *Held*—

That the mortgage was valid and subsisting in the hands of the mortgagee, and consequently continued valid in the hands of the assignee.

It is a well settled rule, that a mortgagor may repledge the security for any lawful purpose.

If the mortgage debt is paid, and if there be no intervening encumbrance, the mortgagor may use the mortgage again, and may pledge it for another debt.

In many cases a subject pledged for a debt may be considered as security for future loans.—Per WILLIAMSON, C.

---

This cause was heard in the Court of Chancery, in February term, 1858, on the pleadings and proofs. By the decree the bill was dismissed, but the taxed costs

were ordered to be paid out of the fund in court. Both parties appealed from this decree. The testimony was very voluminous, but the material facts are stated in the opinions delivered. The Chancellor furnished the following opinion, as containing the reasons of his decree.

WILLIAMSON, C. The only matter of interest to the parties is in reference to the validity of the ten thousand dollar mortgage. If that is a valid and subsisting security in the hands of E. M. Davis, it absorbs all the money in court, $7638.05, and which is all the property involved in this suit.

On the 27th of December, 1853, David C. Urquhart executed his bond to John B. Myers, conditioned to pay him $10,000 in one year from the date thereof, with interest payable half-yearly. Of the same date, Urquhart and his wife executed a mortgage on the "Bloomfield farm," in Delaware township, in the county of Camden, to secure the payment of the money mentioned in the bond, according to the condition of the same. The bond and mortgage were delivered to John B. Myers. On the 26th of September, 1855, John B. Myers assigned the bond and mortgage to Edward M. Davis. On the 28th day of November, 1856, the complainants recovered a judgment against Urquhart for $2359.45, and caused an execution to be issued, and a levy made upon the Bloomfield farm. The mortgaged property has been sold under a decree of this court, upon a bill filed on several mortgages prior in date to the ten thousand dollar mortgage, and the surplus, which I have before mentioned, has been brought into this court. The bill seeks to get the mortgage out of the way.

The *gravamen* of the complaint is, that the mortgage is kept on foot fraudulently. I shall examine the case in the three aspects in which it was presented on the argument. I do not feel the strongest confidence that I have reached the truth of this case. There is no end to the evidence

Robinson *v.* Urquhart.

and the exhibits. This, however, is the smallest part of the difficulty. There is so much contradiction in the testimony, so many enigmas and mysteries in the exhibits, and in the transactions to which they relate, which require solution, and so many explanations attempted to be made by witnesses, which only tend to make the confusion worse confounded, that it is very difficult to feel any degree of assurance, after a most laborious search for the truth, that you have been successful in finding it. In deciding the case, I have felt myself bound to disregard entirely the testimony of both Urquhart and Pilling, except as to facts where they are corroborated by other evidence. Their general characters for truth and veracity are impeached by a number of witnesses. But I do not reject their evidence on account of such impeachment alone. It is their evidence, in connection with their own testimony, that has driven me to the conclusion. They are men who for a number of years have been engaged in extensive mercantile transactions in the city of Philadelphia; and yet, according to their own stories, they have endeavored, by all the arts and contrivances which their ingenuity could suggest; to overreach everybody they ever dealt with, and at the same time, wherever the opportunity offered, to circumvent each other. I would not express this opinion of these witnesses were it not from the fact, that the position they occupy in the cause compels me to do so. If full credit is to be given to their evidence, the complainants must necessarily succeed. This credit I cannot give. It would have been much more agreeable to my disposition to have reconciled, if possible, the numerous contradictions and inconsistencies apparent upon the face of their testimony and from undisputed facts in the case.

The complainants insist—first, that this mortgage was paid and satisfied, while in the hands of John B. Myers, by payment of the debt it was given to secure; second, that if the debt for which the mortgage was given was

once paid, the mortgage could not be kept on foot to secure any other debt, and that consequently its assignment to E. M. Davis was a nullity; third, that the mortgage was kept alive for the purpose of aiding Urquhart to defraud his creditors.

Was the mortgage debt paid while the mortgage was in the hands of John B. Myers so to extinguish and make it invalid as a security? Urquhart wished to make a loan of $10,000, and for this purpose made application to Ellis Pilling, who was a broker, to negotiate it for him. This was effected through John B. Myers, a member of the firm of Myers, Claghorn and Company. The agreement with Myers was, that he should exchange four notes of his firm, of $2500 each, payable six months after date, for Pilling's notes of like tenor, except that they should fall due a few days before the notes advanced by Myers, so as to put him in funds to meet the notes which he had advanced, when they fell due.

It was further agreed that Pilling should deposit collaterals with Myers to secure the former's notes. To carry out this arrangement, the notes were exchanged, on the 14th of January, 1854, and there was placed in Myers' hands, as collaterals, the $10,000 bond and mortgage, a mortgage of $5000, which is known throughout the cause as the $5000 Kensington mortgage, and notes against several individuals and firms, amounting in the aggregate to $8792.50. These securities all belonged to Urquhart. They were delivered by him to Pilling, and by Pilling to Myers, except the $10,000 mortgage, about which there is some dispute as to whether its delivery to Myers was by Pilling or by Urquhart himself. It is but of little consequence, however, as all parties understood that the loan was for Urquhart, and was made through Pilling, as his agent, and that all the securities were advanced by Urquhart. Myers gave his receipt to Pilling for his notes and the securities, in which it was stated that the notes advanced were for Pilling's accommodation, and that the

deposit of securities was made by him. But this receipt could not change the real character of the transaction. Urquhart then gave his notes to Pilling of like amount and tenor as the notes which Pilling had given to Myers, and then Pilling delivered to Urquhart the notes which the former had received of Myers. Pilling's notes became payable on the 13th of July; the notes of Myers, Claghorn and Company fell due three days afterwards. On the 14th of July, in order to enable Pilling to meet his notes, Myers made with him an exchange of notes at five months, and dated June 17th, 1855; and as additional security to those already deposited, Pilling deposited with Myers a mortgage of five thousand dollars on lands in Camden, New Jersey, and which is designated as the brick yard mortgage, and a ground rent security of a thousand dollars. On the 15th of November, Pilling, being unable to meet his notes, which then fell due, another exchange was made of notes at four months. Three last notes of Pilling were never paid until E. M. Davis paid to Myers ten thousand five hundred dollars, and took an assignment of the $10,000 mortgage, on the 26th of September, 1855.

The complainants insist that this mortgage was placed with Myers as a security for Pilling's notes, which fell due on the 13th of July, and that when the notes were paid the security was released. We have seen how the notes were paid—that the debt was not actually paid, but its time of payment extended four months. If Urquhart had stood merely in the light of a security, a guarantor, and Myers had given time to the principal without the consent of Urquhart, the latter might then, with some show of law, if not of equity, set up that his security was discharged. But Urquhart had this money in his pocket. He had given his notes to Pilling for it. He certainly cannot come into a court of equity, and without showing that he has refunded that money, complain of the extension of time which the creditor has given for the pay-

ment of the debt, and claim a right to keep the money, and have the security also. If there is anything in the maxim, that he who claims equity must do equity, it certainly is applicable here. But I think it is proved beyond a doubt that the extension of the time of payment was made with Urquhart's consent. His permitting his own notes to remain in Pilling's hands unprovided for, and then furnishing the two additional securities, the brick yard mortgage and the ground rent security, by which the extension of the debt was effected, with many other circumstances, furnish conclusive evidence that the several renewals of notes between Myers and Pilling were with his consent, as they certainly were for his benefit. He was transacting other business frequently with Myers, and in constant intercourse with him. He was the close companion and friend of Pilling, and in business with him daily. He never asked for the mortgage. He never complained of the transaction. There are, besides these, a great many circumstances in this transaction, which was on foot during a period of two years, which show most conclusively that whatever was done by Pilling in this business was with the knowledge and approbation of Urquhart.

But the complainants further insist, that Myers was in funds, furnished by Urquhart, when Pilling's first notes became due. Admitting this to be so, the facts to which I have alluded are sufficient to show that those funds, if any, were differently appropriated, and that the debt which the mortgage was given to secure was not discharged with such funds, but the debt was kept on foot, and its time of payment extended, with Urquhart's consent. But there is no proof that Myers was in funds. The contrary is apparent. None of the mortgage securities were ever discharged. There remained nothing else but the notes. There is no proof that, on the 13th of July, 1854, any one of these notes was paid. During the whole period they remained in Myers' hands he received upon

them $2896.76. Four of them, amounting to $3181, Urquhart says, in his testimony, he received. The rest of the notes, and the cash received upon them, were delivered to Pilling.

There is evidence enough to show that the disposition made of these collaterals was with Urquhart's full concurrence; and that it was not until a very late period that the thought occurred, or was suggested to Urquhart or Pilling, that there was anything received on these collaterals to pay the mortgage debt. There is proof in abundance that at the date of the assignment to Davis the mortgage debt was unpaid. In addition to all this, on the 17th of February, 1854, Pilling gave to Myers a writing, by which he agreed that all collaterals then deposited by him with Myers, or Myers, Claghorn and Company, or that should thereafter be deposited, might be held by him and them for the payment of any indebtedness of every description then due or thereafter to grow due; and that if at any time they should be dissatisfied with any of said collaterals, they might, on five days' notice to him in writing, sell the same at public or private sale, and apply the same to his indebtedness. This agreement was made with Urquhart's consent. He is one of the subscribing witnesses to it. It is true that the mere fact of a person's being a subscribing witness to an instrument of writing is no evidence that its contents are known to the witness. It is not *prima facie* evidence of such knowledge. Pilling swears that Urquhart did not know its contents. He, then, was entering into a written agreement fraudulently to use securities which were in his hands in trust for a particular purpose, and with a cunning, rarely excelled, getting the apparent consent of his *cestui que trust* to his use of them, by obtaining his signature as a subscribing witness to the very instrument by which he made a pledge of the securities. Myers knew the securities belonged to Urquhart, and that his consent was necessary. It is not hinted that Myers contemplated

2 x*

any fraud. Pilling confesses whatever infamy there is he must bear it all. He confesses to the twofold fraud, of betraying his trust in converting to his own use these securities, and of imposing in this artful manner upon the person with whom he pledged them. I do not know which places Pilling in the worse position, to let him stand convicted by his own testimony of a transaction so infamous, or to discharge him of the infamy by discrediting him as a witness. But Urquhart sustains him, and swears he did not know the contents of the paper. I cannot go through all this evidence to collate the facts; his acts and declarations, oral and in writing, which go either to show he did not know the contents of this paper, or to place him in a worse position than if we disbelieve him on this point. We have a disinterested witness, and one who stands unimpeached. Charles Murphy was a subscribing witness to the paper with Urquhart. The paper is in his handwriting, and was dictated by Pilling. He says they were all together in the store when it was executed, and that it was read over and understood by the parties at the time.

I consider it as proved that this mortgage was pledged, with Urquhart's consent, to secure any indebtedness of Pilling to Myers, Claghorn and Company or to Myers. It is not disputed, that at the time of the assignment to Davis, the balance of accounts between Pilling and the firm made the former their debtor for $15,223.90. Besides the agreement, there was a strong equity that the mortgage should stand as a security for this balance. It all grew out of business transactions, carried on with the firm by Urquhart through Pilling. There was a dispute between Pilling and Urquhart as to the accounts between them; but it finally was acknowledged by Urquhart that he was the debtor, to an amount exceeding $10,000. The original loan was the foundation of the debt, and there was therefore an equity, as between all the parties, independent of the agreement, that the mortgage should stand

as a security for the debt which was owing to Myers, Claghorn and Company.

But the complainants' counsel take another position. They insist that the debt having been paid, the mortgage thereby became satisfied and a nullity, so that it could not be made efficacious as a security for another debt, even with the consent of the mortgagor. In the first place, I think it clearly proved that the mortgage debt was not paid. But if it was actually paid, the proposition of the counsel is not correct. A. makes a mortgage to B. to secure his bond for five thousand dollars, in one year. B., instead of giving A. the money upon the bond, lends him $5000 upon his promissory note, at three months. It is insisted that the mortgagor cannot renew the note without releasing the security, and that if the note is paid the mortgagor cannot repledge the mortgage for another loan. To sustain such a proposition, the counsel cited a number of authorities, which show that if the debt is paid the mortgage is paid. That is all true. But this does not show that the same debt may not be kept alive by renewals of the notes which represent the debt, or that when one debt has been paid, and the mortgage having answered its purpose as respects that debt, it may not again be pledged as a security for another debt.

The mortgage is the property of the mortgagor, and there is no reason why he may not make use of it for any *bona fide* purpose. A debtor may deposit his title deeds to an estate with his creditor, as security for an antecedent debt or upon a fresh loan, and thereby create an equitable lien, which a court of equity will enforce. *Keys* v. *Williams*, 3 *You. & Coll.* 55. A question as to priority of creditors is another matter. But a mortgagor, after he has borrowed money on the mortgage, cannot say, as between himself and his creditor, that the mortgage is invalid. It follows, if he can pledge it and repledge it for his own debt, he may pledge it as a security

for that of a third person. A mortgage is good for future advances where there is no debt actually due, but merely in contemplation. When the real mortgage debt has been actually paid off, another creditor may have the right of substitution or subrogation, and the mortgage be appropriated to pay a debt to which the mortgage, in its origin, had no reference whatever. A court of equity will keep an encumbrance alive, or consider it extinguished, as may best serve the purposes of justice and the just intent of the parties. *Starr* v. *Ellis*, 6 *J. C. R.* 395; *Cheesebrough* v. *Millard*, 1 *J. C. R.* 409; *Berry* v. *Mut. Ins. Co.*, 2 *J. C. R.* 603; *Brinkerhoff* v. *Marvin*, 5 *J. C. R.* 320. In *James* v. *Johnson*, 6 *J. C. R.* 429, Chancellor Kent says: "In many cases, a subject pledged for a debt may be considered as a security for future loans. Cases to this point were referred to in *Hendricks* v. *Robinson* and *Brinkerhoff* v. *Marvin*, 2 *J. C. R.* 309, and 5 *J. C. R.* 326, and I see no objection to it, if no intervening right exists to prevent the justness of the application of the rule, and the plaintiff has no such intervening equity. We are to presume that further debts were created, or advances made on the credit of this original security. It was a rule of the civil law, as was well shown by the decision of the Supreme Court of Massachusetts, in *Jarvis* v. *Rogers*, 15 *Mass. Rep.* 389, that if the debtor pledged property to secure a debt, and afterwards another debt was contracted, the creditor might retain for both debts, provided there was nothing to negative the presumption of an implied contract that the pledge should be so applied.

If I am correct in the views I have expressed, it disposes of the two first points made for the complainants. I think this mortgage was a good security, in the hands of Myers, for the full amount of principal and interest due upon it on the 26th of September, 1855, when he made the assignment to E. M. Davis; that it was good not only against Urquhart himself, but against his creditors; and that there was nothing done by Myers, while he held

the mortgage, which in a court of equity would give a creditor of Urquhart a priority over the security. This mortgage, then, is good in the hands of Myers' assignee, unless the third proposition of the complainants can be established, that the assignment was taken under a covinous agreement to use the mortgage as a cover to the mortgagor's property against his creditors. This part of the case is not free from doubt and difficulty. There are many circumstances which throw a shade of suspicion on the *bona fides* of this assignment which have not been explained. And yet I ought, in connection with this remark, to say that many of these circumstances are of a character that could not be explained, except by these defendants themselves, and which they had not the opportunity of explaining in their answer. There are others, however, which they might have explained, if light was desirable, and of which it is to be regretted they did not give a full explanation.

It is impossible for me, in giving my views of this part of the case, to allude even to the various aspects in which it has been presented by the counsel, or to refer to all the prominent facts which are relied upon to sustain the charge of fraud. The evidence is so voluminous, and the facts and circumstances relied upon so numerous and complicated, that nothing more can be expected of me than a very general glance at the main features which give character to the transaction.

It is proper to look first at the pleadings to ascertain the specific charges which are made by one party, and the denial or explanation given by the other. The bill charges that Urquhart, being embarrassed by his debts, conceived the fraudulent design of hindering, delaying, and defeating his creditors, by placing the Bloomfield cottage farm in the hands of some confidential friend or friends; and that, for the purpose of effecting such fraudulent design, he applied to the house of E. M. Davis and Company to aid him in it, several members of the said

firm being his confidential friends; that Jonathan P. Burton, one of the members of the said firm, purchased and procured a transfer of a judgment in favor of one John J. Smyth against Urquhart at the insufficient consideration of seven hundred dollars, the amount then due upon the same being upwards of $2300, by fraudulently representing that the mortgage of $10,000 was a valid and subsisting encumbrance.

And that shortly after, on or about the 21st day of August, 1855, Urquhart repaid to Burton the sum which he had advanced for the transfer of the judgment; and that, notwithstanding which repayment, the firm of E. M. Davis and Company, in order to carry out the said fraudulent design, suffered the judgment to remain unsatisfied and outstanding in the hands of Burton; that shortly anterior to this time the sheriff had advertised the farm for sale, upon executions in favor of the Smyth judgment and a judgment in favor of one Francis Lee, for upwards of $3500, both of which judgments were subsequent to the $10,000 mortgage; that the time of said sale approaching, Urquhart, the more effectually to carry out his fraudulent design, procured an assignment of the Lee judgment and execution to Charles M. Wharton, a member of the said firm, for the sum of $816, by fraudulently representing to said Lee that the $10,000 mortgage and Smyth judgment were valid encumbrances on the Bloomfield cottage farm. That Urquhart, upon consultation and advice between Davis, Wharton, and himself, procured Wharton to attend the sheriff's sale, and bid off the farm for him, Urquhart, for the nominal sum of five dollars, and to take a deed in the name of Wharton, but for Urquhart's benefit. The bill further charges, that Urquhart, acting in concert with his said confidential friends, on or about the 26th day of September, eighteen hundred and fifty-five, procured the $10,000 mortgage to be assigned by Myers to E. M. Davis, for a fraudulent, nominal, or insufficient consideration, and that the firm of E.

M. Davis and Company now fraudulently set up the mortgage and judgments as valid encumbrances.

The fraud, as charged in the bill against the individual members of the firm of E. M. Davis and Company, is certainly of a very extraordinary character. They are not charged with legal or constructive fraud, with acts although not originating in any actual design to injure the complainants, have in fact, from their natural tendency, inflicted a wrong upon them, for the consequences of which a court of equity will hold the defendants responsible; but they are charged with positive fraud, with acts done *malo animo*, and which injuriously affect their moral character. There is no allegation that they had any debt to secure, or that they were tempted by the prospect of any future pecuniary advantage. No motive whatever is assigned why three members of this firm consented to lend themselves, and the name, reputation, and influ- of their firm, to David C. Urquhart, to aid him in hindering, delaying, and defrauding his creditors. The charge is met by a prompt and unqualified denial by the answer, and explains how it happened that the firm of E. M. Davis and Company became involved in these transactions.

For the sake of convenience and brevity, while looking at the answer made to the specific charges which are relied upon as constituting the alleged fraud, I will, at the same time, refer to some portion of the evidence, both in support and denial of the allegations.

First, as to the Smyth judgment. The answer alleges that the purchase of this judgment by Burton was an individual matter of his own, with which the other members of the firm, individually or as a firm, had nothing to do. Burton explains how he came to purchase the judgment, and in explanation says, that Urquhart had assumed to pay him a debt, which the firm of Parton, Horter and Company owed him in his individual capacity, of about eight thousand dollars, and in payment of the

debt agreed to sell and convey to him a tract of land in
Camden county, adjoining the Bloomfield cottage farm,
containing about twenty-two and a half acres of land,
free and clear of all encumbrances, and represented that
the land was unencumbered, except a mortgage of $1400,
and which Urquhart promised to pay and have cancelled;
that Urquhart did, on the 7th of December, 1854, give
him a deed for the land in payment of the debt; that
afterwards, on investigating the title, he found that, in
addition to the $1400 mortgage, the land was encum-
bered by the Smyth judgment, and that Smyth had levied
on the land, and threatened to sell it; that it was under
these circumstances that he went forward and purchased
the Smyth judgment. He alleges that Urquhart has never
paid or removed the $1400 mortgage, and denies that he
ever paid him the amount he advanced on the judgment,
as is alleged in the answer.

This explanation by Burton of his purchase of the
Smyth judgment is sustained by the evidence, and its
main features are corroborated by the testimony of Ur-
quhart himself. Urquhart did convey to Burton a tract of
land in Camden county, and contrary to the warranty of
his deed and to his agreement, left it encumbered with
this judgment. It was necessary for Burton to pay the
judgment in order to save his land. It is not true, as al-
leged in the bill, that Urquhart afterwards paid or satis-
fied Burton the amount he paid for the assignment of
this judgment. Urquhart attempts to show that, by a
subsequent agreement and transfer of property, Burton
agreed to hold this judgment for him; but the impres-
sion sought to be conveyed by the bill, that Urquhart re-
paid him the seven hundred dollars, is untrue. There is
no proof that Burton made any false representations in
procuring the judgment. The plaintiffs in the judgment,
who would be the first to complain of the wrong, if any
was committed, express no dissatisfaction with the con-
duct of Burton.

As to the Lee judgment, the charge that it was pro-
cured from the plaintiffs by false representations, does not
depend altogether upon the fact, whether the ten thou-
sand dollar mortgage and the Smyth judgment were sat-
isfied. Urquhart says that he falsely represented to Lee
that these encumbrances did exist, and by such represent-
ations induced the plaintiffs to take eight hundred and
sixteen dollars for their judgment of upwards of $3500.
Now it is proved beyond all dispute that there had been
a long contest about this judgment debt. The matter was
compromised; judgment was entered for the full amount
of $3500, and then Urquhart, with his father-in-law, gave
their joint note for $816, with an agreement that if the
note was paid it should be in satisfaction of the judg-
ment. If the note was not paid then, Lee and Company
had a right to enforce their judgment for the full amount.
The note was not paid, and the judgment was about be-
ing enforced. It was in this way that the sum of $816
came to be fixed as the amount which was paid for the
judgment.

But I must say, it is not satisfactorily explained by any
of these defendants why E. M. Davis and Company paid
off this judgment. It is admitted, by the bill, that Whar-
ton paid the money, and took the assignment for the firm.
But for what object was it paid, and for whose benefit?
E. M. Davis and Company held at this time the $10,000
mortgage. It was prior in date to the Lee judgment. The
property, it is true, was about to be sold upon executions
at law, but such sale could not affect the mortgage lien
of the defendants. But, on the other hand, even if the
fraud was contemplated which Urquhart alleges, that the
property was to be bought in by one of the members of
the firm, and held for this benefit, yet it was not neces-
sary to pay $816 to these creditors to accomplish that ob-
ject, for their judgment was subsequent to the mortgage.
It was suggested, by counsel, that Lee and Company in-
tended to contest the validity of the mortgage, and that

to avoid this it was taken up. If they contemplated anything of the kind, and this constituted the inducement for the purchase of the judgment, it might very easily have been proved, and not been left to mere conjecture. It certainly would have been better for the defendants to have sworn to this in their answer than to have left it to be suggested by their counsel.

As to the purchase of the farm by Wharton at the sheriff's sale, there is nothing to excite suspicion of any unlawful design in the mere fact of the purchase, or in the price he gave for it. It has since turned out that the property was not worth enough to pay the encumbrances; and if the $10,000 mortgage should be sustained as valid, the proceeds in court will pay but little over one half the mortgage. Urquhart swears that the purchase was made by Wharton upon an agreement made with him that the property should be held for his benefit. He states a great deal that was said and done, in order to show that this was a fraudulent agreement; but in all the particulars which have a tendency to show any fraud on the part of Wharton, Urquhart is contradicted emphatically by a witness whom Urquhart swears he had just retained as his counsel, and who was acting for him. But after a most diligent examination of all the incidents connected with the sale, I am forced to a conclusion that, notwithstanding the denial of the answer, Urquhart is corroborated thus far, that Wharton made that purchase with an understanding that Urquhart might redeem the property. At the request of Urquhart, Wharton was sent over from Philadelphia, by E. M. Davis and Company, to attend the sale; at the urgent solicitation of Urquhart, he purchased the Lee judgment; it was understood that Wharton was to become the purchaser at the sale; Urquhart urged that the sale should then go on, while Wharton hesitated; Urquhart was foremost in proclaiming the encumbrances, so that the property might not be run up against his bid; the money that was paid in bringing

about the sale was charged on E. M. Davis and Company's books to Urquhart. I believe what Mrs. Urquhart says, that when her husband brought Wharton out to see the farm, he was introduced to her by her husband as the gentleman that had purchased the place for them, and that it was with this understanding that Mrs. Urquhart released to Wharton her right of dower. There was no fraud in such an agreement. It was no injury to Urquhart's creditors for Wharton to say, "I will purchase the property, and will give you the privilege of redeeming it by paying the advances." Mr. Wharton had a right to make such an agreement for the protection of the firm. They had the $10,000; the property was an inadequate security, and no creditor could be injured by any agreement as to such a future disposition of the property. The wrong does not consist in making the agreement, but in the defendants concealing it and denying it in their answer. The admission of the agreement would have helped the defendants' case. It would have explained every feature in the transaction which now remains unexplained and casts a shade over its integrity. There is no way of explaining the particulars I have above referred to consistent with honesty, except by admitting that some such agreement was made between the parties. The ingenuity of counsel did not suggest any upon the argument.

But it is shown by the bill, and admitted on all sides, that there was no fraud in the purchase, if the $10,000 mortgage was a valid encumbrance on the property to the amount of its face. The alleged invalidity of this mortgage is the foundation of the fraud. There is nothing else for it to rest upon. If it was paid off in the hands of Myers then it was invalid. But we have considered this view of the case, and have reached to the conclusion that it was a valid mortgage in the hands of Myers, and that his assignment would confer a good title upon his assignee. The answer alleges, and the defend-

ants prove, that when the assignment was made to E. M.
Davis, he paid to Myers ten thousand five hundred dollars. Here, then, we have the whole case made by the
complainants' bill as to the mortgage disproved. The allegation is, that the mortgage was paid off while in the hands
of Myers, and was afterwards assigned to E. M. Davis,
for a fraudulent, nominal, or insufficient consideration.

The defendants prove that it was not paid off while in
the hands of Myers, and that the consideration they paid
was $10,500.

This, I think, disposes of the case of actual fraud, as
it is charged by the pleadings. Now the complainants
change their ground. They admit that the $10,500 was
paid by Davis for the firm when he took the assignment;
but they allege, that by a previous arrangement made between Jonathan M. Burton and Urquhart, there were at
the same time transferred to different members of the
firm, and to others for their benefit, securities to the
amount of twenty-eight thousand dollars besides the
$10,000 mortgage, and that E. M. Davis and Company
were to reimburse themselves out of the other securities,
the $10,500 they advanced, and keep the mortgage alive
for Urquhart's benefit, so as to protect the property from his
creditors. This is certainly a very different fraud from that
alleged in the bill. It is true, where a bill is filed to impeach a transaction on the ground of fraud, the complainant is not obliged to specify minutely the facts and circumstances upon which he relies to establish the fraud.
These are matters of evidence. But neither is a general
charge of fraud sufficient. A general statement of the
precise facts is often sufficient, and the circumstances
which go to confirm and establish it need not be minutely
charged. *Story's Eq. Pl.* 252. If the circumstances are
stated minutely, the complainant need not prove them
all, nor is he confined to such as are stated. But a complainant cannot charge a fraud, and set out general facts
to sustain it, and when those facts are disproved *in toto*,

Robinson *v.* Urquhart.

resort to others to sustain his charge.  He cannot allege that a mortgage has been paid off by him, and was kept on foot to defraud his creditors, and that to aid him in this design, the defendant took an assignment of the mortgage for a nominal consideration, and when the defendant proves that the mortgage was not paid off in the hands of the mortgagee, and that he paid the full face of the mortgage as the consideration of the assignment, then turn around and prove, not a fraud consisting in the fact that the defendant took an assignment of a paid off mortgage for a nominal consideration, but that he took the assignment of a valid mortgage, paying for it a full consideration, but which consideration was furnished by the mortgagor himself.  In the case of *Mundy* v. *Knight*, 3 *Hare* 500, the Vice Chancellor says, "Where a bill alleges a specific case as a ground for relief, and then charges that the defendant committed fraud, the court is bound to consider the general charge of fraud with reference to the particular allegations.  For that there are many authorities.  But where the bill contains only general charges of fraud, and does not explain in detail what the nature of the fraud is, there is more difficulty in applying a rule."  In this bill the specific fraud is charged, and the facts and circumstances which constitute it.  The charge must be considered with reference to the particular allegations.

I think I might properly dismiss this suit here, and if I consulted my convenience I would do so.  I have examined the case, however, in the new aspect in which it has been presented, with a desire to do all in my power to give satisfaction to the parties.

This part of the case depends entirely upon the testimony of Urquhart.  It is said he is corroborated by several important papers, which are presented as exhibits.  The papers do not corroborate him at all.  In order to make them correspond with his story, he is called upon to interpret them; and it is only when he has thus been per-

2 Y*

mitted to give them a significancy and meaning which
the natural import of their language does not convey
they are made to correspond with his version of the
transaction.

He says, that on the 21st of August, 1855, Burton and
himself entered into an agreement, by which E. M. Davis
and Company were to advance to Myers, Claghorn and
Company sufficient money to release certain securities
which they held in their hands; that Urquhart was then
to have transferred to Burton two mortgages on property
in Kensington, one of $5000 and the other of $2000; the
Bloomfield mortgage of $10,000; the brick yard mort-
gage of $5000; two Pitfield mortgages of eight hundred
and twenty-five dollars each; the Master judgment of
$5000, and bills receivable of the old firm of Parton,
Horter and Company, amounting in all to $38,650; that
Burton, on his part, was to transfer or release all claims
against Urquhart, William R. Griers, William R. Griers
and Company, Parton, Horter and Company, and Wash-
ington Horton, and to settle the judgment with Francis
Lee. The Smyth and Lee judgments and the $10,000
mortgage were to be held for Urquhart's benefit. To
prove the truth of this statement, Urquhart produces an
agreement signed by himself and Burton. It is in the fol-
lowing words.

"Agreement made August 21st, 1855, between D. C.
Urquhart and J. P. Burton. Urquhart to have released
or transferred to J. P. Burton the two mortgages on Ken-
sington ground, for seven thousand dollars. Burton to
transfer or release all claims against Urquhart, William
R. Griers, William R. Griers and Company, Parton, Hor-
ter and Company, and Washington Horton, also settle with
Francis Lee for his claim against Urquhart; and should
it be deemed proper for securing any part of the above
claims, to dispose of Urquhart's property in New Jersey.
Burton will allow him, Urquhart, the privilege of reselling
said property for his own benefit, after complying with
the above terms regarding the Kensington mortgages."

There is nothing unlawful on the face of this agreement, and it is only made so by the construction Urquhart puts upon it. Urquhart says the property referred to in the agreement as the Jersey property, which he was to have the privilege of reselling ,was the Bloomfield property. Griers, who is the subscribing witness to the agreement, says he was present when it was drawn up, and heard all that was said between the parties in regard to it; that nothing was said about any other property than that mentioned in the agreement; that the Jersey property referred to is the property near Camden known as the mill property, which was then about to be sold, and for which Urquhart said he had an offer, with the nine acres adjoining. The complainants rely upon what took place subsequently as corroborative of Urquhart. On the 26th of September 1855, Myers assigned to E. M. Davis the $10,000 mortgage and the $5000 brick yard mortgage, and Davis paid him $10,500. On the same day, Myers transferred to J. P. Burton the two Kensington mortgages of $5000 and $2000. These three mortgages were deposited with Myers to secure a debt which he alleged Urquhart owed him, and he agreed to release them upon the payment of $10,500. Why were the $5000 and $2000 mortgages assigned to Burton? We have heard Urquhart's statement, and what answer is given to it? Parton, Horter and Company were largely indebted to E. M. Davis and Company; Urquhart settled with them, and conveyed to them twelve ground rents in Kensington. Where was this mortgage of $5000 on the property which Urquhart had concealed from E. M. Davis and Company? He told Griers they did not know it, and that it was to be quietly removed. Urquhart was also to put up certain houses which he had contracted for, and without which the property was valueless. He said he had reserved enough of the assets of Parton, Horter and Company, a firm which had failed, to enable him to put up the houses. In some arrangement between E. M.

Davis and Company and Burton the debt of Parton, Horter and Company was charged to Burton, and he became the owner of the twelve ground rents. It was in this way that Burton became entitled to the Kensington mortgages, and they were transferred to him because they belonged to him. The evidence shows inducement enough for the advance of the $10,500. There was no other way in which Burton could get the Kensington mortgages, which stood pledged in the hands of Myers for Urquhart's debts. As to the Pitfield mortgages, the Master judgment, and the bills receivable, which Urquhart says were to be transferred, there is no evidence that they ever were transferred to E. M. Davis and Company or any member of the firm. They were placed in the hands of Mr. Gillow, and E. M. Davis and Company have had nothing to do with them. Pilling says he received the securities from Urquhart, and deposited them with Mr. Gillow, and that is all we have of any evidence as to how they got in Mr. Gillow's hands.

Now the only thing suspicious, and which was dwelt upon very much by the complainants, and with much force, is the concealment, in the answer, of the fact of the transfer to Burton of the Kensington mortgages at the same time of the transfer to E. M. Davis of the $10,000 mortgage. It would seem to furnish a very satisfactory reason for E. M. Davis and Company's taking out of their business $10,500 to advance for the Bloomfield mortgage. The fact, that the defendants did not disclose in their answer the simultaneous assignments to Davis and Burton, and give the reason for the advance of the $10,500 which I have suggested, or some other satisfactory one, makes me distrust somewhat the view I have taken of the evidence. Why did Davis and Company advance $10,500 upon the two mortgages? They prove the brick yard mortgage to be worth only about $2000. Urquhart gave only $2100 for the property. The securities were certainly a very scanty security for the money advanced upon them;

Robinson *v.* Urquhart.

and it was but a reasonable expectation that the defendants, when they had the opportunity, should have given some reason, if they had any consistent with honesty, for adventuring so large a sum in so unprofitable a speculation, and for such a man as they have endeavored to prove Urquhart to be.

There are suspicious circumstances about this transaction which cast a shade upon it. There is some propriety in the remark of counsel, that the answer looks very much as if it had been drawn rather with a view of dissolving the injunction than with the expectation of further investigation. Without declaring myself perfectly satisfied that there is no ground for the bill, I will content myself with the conclusion, that the complainants have not proved their case.

If the Bloomfield cottage farm had not been sold, and the title was still in Urquhart, I should feel myself justified in making a decree, that the complainants might redeem by paying to the defendants the advances which they had made. When a deed is sought to be set aside as voluntary and fraudulent against creditors, and there is not sufficient evidence of fraud to induce the court to avoid it absolutely, but there are suspicious circumstances as to the adequacy of the consideration and fairness of the transaction, the court will not set aside the conveyance altogether, but will permit it to stand as security for the sum actually paid. *Boyd* v. *Dunlap*, 1 *J. C. R.* 478. But the property in controversy is not such as to justify such a decree.

The real estate has been sold under prior encumbrances. The surplus is in court, and is not sufficient to pay the defendants the advances they have paid. If the complainants, however, are willing to pay the defendants the difference between the amount of money in court and the principal and interest on $10,500, from the time the defendants advanced that money, I will make a decree to give the complainants the benefit of the $5000 brick yard

mortgage. This would be right upon the plainest prin-
ciples of equity. The defendants say, in their answer,
that they advanced $10,500 for the assignments of the
Bloomfield and brick yard mortgages. They hold them
merely as security for the debt. If the debt is paid, the
complainants have no further interest in the mortgages,
and the creditors of Urquhart are entitled to them. I pre-
sume the complainants do not desire such a decree, as it
is evident the two mortgages will not more than pay the
defendants' debt.

I shall therefore decree that the bill be dismissed, and
that the taxed costs of the suit be paid out of the fund in
court, and the balance to the defendants, E. M. Davis and
Company. I think it is right that the fund should pay
the costs. The answer provoked further litigation. It is
not as full as it should have been. It does not give the
true character of the transaction connected with the as-
signment. It conceals the fact of the assignment to Bur-
ton; the complainants were entitled to that fact, and the
reason for it. The answer does not give a satisfactory rea-
son for the purchase of the Lee judgment, and there is
no satisfactory explanation by the proofs taken. The pur-
chase by Wharton was made with an understanding im-
plied, if not expressed. The charges in their books are
not altogether consistent with their defence. In looking
at the evidence, I cannot consider the defendants free
from fault.

*P. L. Voorhees* and *A. Browning*, for appellants.

*T. H. Dudley* and *Attorney General*, for respondents.

The opinion of the court was read by

HAINES, J. The controversy is about the surplus money
remaining after the payment of the amounts due upon
the mortgages of Mr. Hale and of Captain Mickle, and
as that surplus is less than the amount due on the mort-

gage made to Myers, the only question necessary to be considered on the merits is the validity of that mortgage.

It is admitted that the mortgage was executed for a lawful purpose, and used as collateral security for the payment of the notes of Pilling, which he had given to Myers, Claghorn and Company in exchange for their notes, on which he raised money for Urquhart. Other collaterals were also delivered to Myers and Company by Pilling, but they were all furnished by Urquhart, so that, excepting the notes of Pilling, Urquhart furnished all the securities.

When the notes of Pilling became due they were paid by the avails of other notes made by Myers and Company, and delivered to him in exchange for other notes made by him. Again, when the second set of notes matured, they were paid, in like manner, by another exchange of notes of Myers and Company for those of Pilling. The money advanced by Myers and Company was not paid by Pilling or Urquhart, nor does it appear that it was realized out of any of the collaterals. The notes given for it were renewed, but as between those parties, were never paid. The debt, which is the principal, was still subsisting; the bond and mortgage which were held as collateral, and which are incident, were not discharged. In the hands of John B. Myers, who held them for the the benefit of Myers and Company, they were good, and remained as a valid and subsisting lien on the property.

On the 26th September, 1855, some six months after the notes given by Pilling became due, and while they were yet unpaid, Edward M. Davis advanced to Myers $10,500, and took an assignment of the bond and mortgage; and it is insisted that this assignment to Davis was unlawful, and that the mortgage could not be continued to secure a debt to another person.

To this objection it may be answered—first, that a mortgage valid and subsisting in the hands of a mortgagee may be assigned, and continue valid in the hands of

the assignee. The consideration of the assignment may pay to the mortgagee the money he had advanced, but that cannot release the mortgagor, who still withholds the money he received.

Again, it is well settled that a mortgagor may repledge the securities for any lawful purpose. If he is to pay the debt for which they were given, and if there be no intervening encumbrance, he may use them again, and pledge them for another debt; and if he do use them, he cannot complain that he is required to pay the debt for which they are so repledged. Nor, in the absence of fraud, has an encumbrancer by mortgage or judgment, obtained after such repledging, any cause of complaint.

The assignment of the bond and mortgage by Myers to Davis was made with the knowledge and consent of Urquhart, as is admitted by him in his certificate, dated October 3d, 1855.

In that certificate he acknowledges that no part of the principal or interest secured by that mortgage had been theretofore paid, but that the whole amount thereof was then yet due and payable.

If the mortgage was valid in the hands of Myers, and was by him assigned for a valuable consideration, as has been shown, and if it was so assigned by the consent of Urquhart, as his certificate proves, it must be held to be a good and subsisting claim in the hands of Davis; and against such evidence the testimony of Urquhart and Pilling, given in the cause, can and ought to have no weight. Their testimony in so contradictory to their own statements, verbal and written, and to the statements of each other, and so directly in conflict with that of other witnesses, and they are, upon their own admissions, so reckless of truth, and so wholly devoid of integrity, that no reliance can be placed on what they say. As such assignee of the mortgage, Davis had a right to retain it as a lien on the property until the debt for which it was pledged was paid. He and the firm for whom he held it

are not to be prejudiced by anything that Pilling or Urquhart, without their acquiescence, could do or say to delay or defraud creditors or to cheapen the property at the first sale.

There is no evidence that the mortgage was fraudulently kept on foot, nor of any motive or reason why Davis and Company, who had paid for it in cash, $10,500, should collude with Urquhart to defraud his creditors, and thereby put in jeopardy their own securities.

If the mortgage was a valid lien on the property, there was sufficient inducement for Smyth and Lee to sell their judgment at a large discount; and the result of the sheriff's sale under the original mortgage shows their prudence in so doing; and the creditors of Urquhart were not prejudiced by the fact of Burton and Wharton becoming the purchasers of those judgments.

Nor can any evidence of fraud be gathered from the fact of the purchase of the equity of redemption by Wharton at the first sheriff's sale; nor from his taking a release of the right of dower of Mrs. Urquhart; nor yet from any arrangement to afford Urquhart an opportunity to redeem. These were all lawful acts, and do not of themselves, or in connection with any other facts in the case, show any fraud or collusion.

The decree refusing to declare the mortgage and the judgment void and dismissing the bill was correct, and should be affirmed.

But Davis and Company have also appealed, and thereby questioned that part of the decree which ordered the costs to be paid out of the fund. That appeal is properly here. It was duly filed, and the usual deposit for costs made. Davis and others, it is true, did not print the case, but the other party did; and no application was made to the court for any order respecting the printing, or for any apportionment of the expense of it. We must therefore consider the matter which is the subject of this appeal fairly before us.

Robinson *v.* Urquhart.

The answer is not as full and explicit as it might and should have been; and the defendants omitted, or did not satisfactorily explain, several matters connected with the assignment of the securities and the purchase of the Lee judgment. For such omission they are censurable. But the penalty of the payment of the whole costs on both sides is too severe. It will be a sufficient punishment if they are required to pay their own costs in the court below. That part of the decree, therefore, which directs the costs to be paid out of the fund is erroneous, and must be reversed, leaving each party to pay their own costs below.

But that part of the decree which refused to declare the mortgage and the judgment void, and dismissed the bill, must be affirmed, and the costs of both appeals be paid by the appellants, Robinson and Parsons.

The court affirmed the decree of the Chancellor (except as to the part relating to the costs below, which was reversed) by the following vote:

*For affirmance*—CHIEF JUSTICE, Judges COMBS, CLAWSON, HAINES, SWAIN, VREDENBURGH, CORNELISON, OGDEN, WHELPLEY, WOOD.

*For affirmance in toto*—Judges VALENTINE, VAN DYKE.

*For reversal*—None.